# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CHARLES SMITH ENTERPRISES, LLC,<br><br>               Plaintiff,<br><br>     v.<br><br>CATAPULT SPORTS, INC.,<br><br>               Defendant. | Civ. A. No. 1:21-cv-01278-CFC<br><br><br>JURY TRIAL DEMANDED |
| CHARLES SMITH ENTERPRISES, LLC,<br><br>               Plaintiff,<br><br>     v.<br><br>DVSPORT, INC.,<br><br>               Defendant. | Civ. A. No. 1:21-cv-01279-CFC<br><br><br>JURY TRIAL DEMANDED |

## JOINT CLAIM CONSTRUCTION BRIEF

## TABLE OF CONTENTS

I.    AGREED-UPON CONSTRUCTIONS .........................................................1

II.   DISPUTED CONSTRUCTIONS .............................................................2

    A.   Introduction ...................................................................................3

        1.   Plaintiff's Introduction .........................................................3

        2.   Defendants' Introduction ....................................................10

    B.   The Parties' Positions on Terms 1-3, "a customizable media logging system for indexing media" (Term 1) and "media" or "the media" (Terms 2 and 3) ............................................................12

        1.   Plaintiff's Opening Position on Terms 1-3 .........................13

        2.   Defendants' Answering Position on Terms 1-3...................16

        3.   Plaintiff's Reply Position on Terms 1-3 .............................19

        4.   Defendants' Sur-Reply Position on Terms 1-3....................24

    C.   The Parties' Positions on Terms 11, 13, 14, 17, 19, 20 and 21, "customizable" and "custom" ....................................................28

        1.   Plaintiffs' Opening Position on Terms 11, 13, 14, 17, 19-21 ...........30

        2.   Defendants' Answering Position on Terms 11, 13, 14, 17 and 19-21......................................................................32

        3.   Plaintiff's Reply Position on Terms 11, 13, 14, 17 and 19-21 .........38

        4.   Defendants' Sur-Reply Position on Terms 11, 13, 14, 17 and 19-21......................................................................42

    D.   The Parties' Positions on Terms 15, 16 and 22, "graphical user interface generator" ...................................................................44

        1.   Plaintiff's Opening Position on Terms 15, 16 and 22........................44

        2.   Defendants' Answering Position on Terms 15, 16 and 22 ...............45

3.    Plaintiff's Reply Position on Terms 15, 16 and 22............................48

4.    Defendants' Sur-Reply Position on Terms 15, 16 and 22 .................51

E.    The Parties' Positions on Terms 12 and 18, "timer object"....................55

1.    Plaintiff's Opening Position on Terms 12 and 18.............................55

2.    Defendants' Answering Position on Terms 12 and 18 ......................56

3.    Plaintiff's Reply Position on Terms 12 and 18..................................57

4.    Defendants' Sur-Reply Position on Terms 12 and 18 .......................58

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alloc, Inc. v. ITC*,
  342 F.3d 1361 (Fed. Cir. 2003) ........................................................20

*Apple Inc. v. Andrea Elecs. Corp.*,
  949 F.3d 697 (Fed. Cir. 2020) ..........................................................52

*Aventis Pharms., Inc. v. Amino Chems. Ltd.*,
  715 F.3d 1363 (Fed. Cir. 2013) ..........................................................6

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
  713 F.3d 1090 (Fed. Cir. 2013) ........................................................35

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
  388 F.3d 858 (Fed. Cir. 2004) ............................................................7

*Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*,
  677 F.3d 1361 (Fed. Cir. 2012) ........................................................46

*Cont'l Circuits LLC v. Intel Corp.*,
  915 F.3d 788 (Fed. Cir. 2019) ..........................................................17

*Cordis Corp. v. Medtronic Ave, Inc.*,
  511 F.3d 1157 (Fed. Cir. 2008) ........................................................42

*EPOS Techs. Ltd. v. Pegasus Techs. Ltd.*,
  766 F.3d 1338 (Fed. Cir. 2014) ..................................................16, 24

*Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.*,
  93 F.3d 1572 (Fed. Cir. 1996) ..........................................................59

*Every Penny Counts, Inc. v. Am. Express Co.*,
  563 F.3d 1378 (Fed. Cir. 2009) ........................................................32

*Finjan, Inc. v. Secure Computing Corp.*,
  626 F.3d 1197 (Fed. Cir. 2010) ........................................................37

*GE Lighting Solutions, LLC v. AgiLight, Inc.*,
  750 F.3d 1304 (Fed. Cir. 2014) ..........................................................7

*Golden Bridge Tech., Inc. v. Apple Inc.*,
  758 F.3d 1362 (Fed. Cir. 2014) ........................................................................7

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
  755 F.3d 1367 (Fed. Cir. 2014) ......................................................................24

*Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*,
  450 F.3d 1350 (Fed. Cir. 2006)......................................................................46

*Johns Hopkins Univ. v. CellPro, Inc.*,
  152 F.3d 1342 (Fed. Cir. 1998) ......................................................................20

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
  358 F.3d 898 (Fed. Cir. 2004) ........................................................................52

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
  521 F.3d 1351 (Fed. Cir. 2008) .................................................................passim

*Omega Eng'g, Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) .............................................................35, 49, 53

*Openwave Sys., Inc. v. Apple Inc.*,
  808 F.3d 509 (Fed. Cir. 2015) ..................................................................49, 53

*Orion IP, LLC v. Staples, Inc.*,
  406 F. Supp. 2d 717 (E.D. Tex. 2005)............................................................38

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ..................................................passim

*Phonometrics, Inc. v. N. Telecom Inc.*,
  133 F.3d 1459 (Fed. Cir. 1998) ......................................................................52

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
  182 F.3d 1298 (Fed. Cir. 1999) ......................................................................10

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*,
  653 F.3d 1296 (Fed. Cir. 2011) ......................................................................33

*Schindler Elevator Corp. v. Otis Elevator Co.*,
  593 F.3d 1275 (Fed. Cir. 2010) ..................................................................49, 53

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
   242 F.3d 1337 (Fed. Cir. 2001) ...................................................................20, 45

*Standard Oil Co. v. Am. Cyanamid Co.*,
   774 F.2d 448 (Fed. Cir. 1985) ...................................................................35

*SuperGuide Corp. v. DirecTV Enters., Inc.*,
   358 F.3d 870 (Fed. Cir. 2004) ...................................................................14

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
   135 S. Ct. 831 (2015)...................................................................7, 22

*The Medicines Company v. Mylan, Inc.*,
   853 F.3d 1296 (Fed. Cir. 2017) ...................................................................*passim*

*Thorner v. Sony Computer Entm't Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012) ...................................................................7, 8, 46

*Trs. of Columbia Univ. v. Symantec Corp*,
   811 F.3d 1359 (Fed. Cir. 2016) ...................................................................7

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) ...................................................................10, 44

*Williamson v. Citrix Online, LLC*,
   792 F.3d 1339 (Fed. Cir. 2015) ...................................................................6

## Statutes

35 U.S.C. § 112...................................................................2

## I.   AGREED-UPON CONSTRUCTIONS

There are no agreed-upon constructions between Plaintiff Charles Smith Enterprises, LLC ("CSE" or "Plaintiff") and Defendants Catapult Sports, Inc. ("Catapult") and DVSport, Inc. ("DVSport"), collectively "the Defendants" (which, together with the Plaintiff, are referred to as "the Parties").   However, after the submission of the Joint Claim Construction Chart on October 24, 2022 (D.I. 42) and during the exchange of claim construction briefs between Plaintiff and the Defendants, seven terms were dropped from consideration, namely those designated Terms 4-10 during that briefing, which are set forth below:

| Term Number and Claims | Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| Term 4 <br><br> claim 1 of the '010 patent | "timer object that provides a time reference" | No construction necessary; Not subject to 35 U.S.C. § 112(6); and Not indefinite | Claim term construed under 35 U.S.C. § 112(6). Indefinite. |
| Term 5 <br><br> claim 1 of the '010 patent | "a logger object that logs" | No construction necessary; Not subject to 35 U.S.C. § 112(6); and Not indefinite | Claim term construed under 35 U.S.C. § 112(6). Indefinite. |
| Term 6 <br><br> claim 1 of the '010 patent | "graphical user interface generator that generates" | No construction necessary; Not subject to 35 U.S.C. § 112(6); and Not indefinite | Claim term construed under 35 U.S.C. § 112(6). Indefinite. |

| Term Number and Claims | Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| Term 7<br><br>claim 1 of the '876 patent | "events administrator programmed logic circuitry" | No construction necessary;<br>Not subject to 35 U.S.C. § 112(6); and<br>Not indefinite | Claim term construed under 35 U.S.C. § 112(6).<br>Indefinite. |
| Term 8<br><br>claim 1 of the '876 patent | "timer object configured to provide a time reference" | No construction necessary;<br>Not subject to 35 U.S.C. § 112(6); and<br>Not indefinite | Claim term construed under 35 U.S.C. § 112(6).<br>Indefinite. |
| Term 9<br><br>claim 1 of the '876 patent | "logger object configured to log" | No construction necessary;<br>Not subject to 35 U.S.C. § 112(6); and<br>Not indefinite | Claim term construed under 35 U.S.C. § 112(6).<br>Indefinite. |
| Term 10<br><br>claim 13 of the '876 patent | "a GUI generator configured to generate" | No construction necessary;<br>Not subject to 35 U.S.C. § 112(6); and<br>Not indefinite | Claim term construed under 35 U.S.C. § 112(6).<br>Indefinite. |

Therefore, because the above seven terms have been dropped from consideration, the issues of whether any claim term is written in "means-plus-function" language and whether any such term is indefinite under 35 U.S.C. § 112, ¶ 2 are no longer before the Court as part of this claim construction briefing.

## II.   DISPUTED CONSTRUCTIONS

There are fifteen disputed claim terms between Plaintiff and the Defendants,

which the Parties have now grouped through their briefing into four categories for ease of the Court's consideration. Specifically, these four groups are Terms 1-3 ("a customizable media logging system for indexing media" and "media" or "the media"), Terms 11, 13, 14, 17, and 19-21 ("customizable"/"custom"), Terms 15, 16 and 22 ("graphical user interface generator") and Terms 12 and 18 ("timer object").

The Parties respective positions are set forth below, in detail.

## A. Introduction

### 1. Plaintiff's Introduction

#### a. Summary of Plaintiff's Argument

The asserted claims in these cases by Plaintiff CSE are at least claims 1, 4-5 and 8-10 of U.S. Patent No. 6,877,010 ("the '010 patent") and at least claims 1-6, 9-11, 13 and 14 of the related U.S. Patent No. 7,756,876 ("the '876 patent") collectively "the asserted patents" or "the patents in suit."[1]

Defendants have proposed constructions for twelve, separate terms. *See* Joint Claim Construction Chart ("JCCC," D.I. 42). None of those twelve terms actually requires construction, as the plain and ordinary meaning of each term is apparent to a person of ordinary skill in the art ("POSA") from the claim language.[2]

---

[1] Claim 5 of the '010 patent and claim 6 of the '876 patent are not presently asserted against DVSport.

[2] Dr. Edwin Hernandez, Ph.D., explains a POSA in his declaration ("Hernandez," Ex. 1), which is part of the Joint Appendix. (*See* Hernandez at ¶¶ 27-28, in 1999 "a person with (i) a B.S. in computer science or a closely related field, with two or more

In sharp contrast, Plaintiff proposed only three terms for construction, each of which relates to the term "media" and the express requirement in the patent that such media be in MPEG stream format for the customizable system of the invention. Plaintiff's constructions should be adopted.

Defendants ignored the intrinsic record of the patents in suit requiring construction of Terms 1-3 ("a customizable media logging system for indexing media" and "media" or "the media") in the manner proposed by Plaintiff, and engaged in wholesale rewriting of Terms 11-22 ("customizable"/"custom," "graphical user interface generator" and "timer object") by importing limitations from the specification (such as "on the fly") into those terms.  Plaintiff's claim construction positions should be adopted and Defendants' positions should be rejected.

There is a "***heavy presumption that claim terms are to be given their ordinary and customary meaning***" because "the words of the claims themselves . . . define the scope of the patented invention."[3] *Aventis Pharms., Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013).  "Ordinary and customary" means how a

---

years of experience in computer programming or (ii) an M.S. in computer science. Additional education or experience may serve as a substitute for these qualities." That definition is applied in this brief by Plaintiff.  The '010 patent (Ex. 2) and '876 patent (Ex. 3) and their file histories (Ex. 4 is the '010 file history; Ex. 5 is the '876 file history) are also part of the Joint Appendix.

[3] Unless noted otherwise, all emphasis herein in Plaintiff's sections is added.

POSA at the time of the invention would have understood the term as it is used in the claim. *Phillips v. AWH Corp*., 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*). Here, none of Terms 11-22 ("customizable"/"custom," "graphical user interface generator" and "timer object") needs construction, and the ordinary and customary meaning of each of those terms to a POSA should be applied.

When necessary, intrinsic evidence is typically "the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315. Yet, it is a "cardinal sin" to simply read a limitation from the specification into the claims, *see Phillips*, 413 F.3d at 1320 (*see also Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1346-47 (Fed. Cir. 2015)), which is precisely what Defendants are wrongly attempting to do with regard to each of Terms 11-22. . There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution." *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014). Plain meaning governs "[a]bsent implied or explicit lexicography or disavowal." *Trs. of Columbia Univ. v. Symantec Corp*, 811 F.3d 1359, 1364 n.2 (Fed. Cir. 2016).

Extrinsic evidence can play a role, but it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)).  Expert testimony may be useful such as, for example, on the background science or the meaning of a term in the relevant art during the relevant time period.  *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

Here, Defendants turn the above law of claim construction on its head, in a results-oriented attempt to rewrite Terms 11-22 to their apparent advantage and ignore the meaning of Terms 1-3 to a POSA required from the specification of the asserted patents.  First, Defendants argue that Terms 1-3 ("a customizable media logging system for indexing media" and "media" or "the media") should not be construed to require the media to be in an MPEG stream format, despite the express direction otherwise to a POSA in the specification.  Defendants also criticize the expert declaration of Dr. Hernandez that contradicts their position on Terms 1-3 (*see* Hernandez at ¶¶ 39-43), but do not substantively address any of his opinions.  At the same time, Defendants improperly import limitations (such as "on the fly") from the specification of the asserted patents into Terms 11-22 ("customizable"/"custom," "graphical user interface generator" and "timer object"), under the guise of "construing" those terms.

Defendants unfounded efforts should be rejected and Plaintiff's claim

construction positions should be adopted.

### b. Plaintiff's Background of the Technology

Charles Smith-Semedo, Rolando Blackman, Stephen Jacobs, Guerrino Lupetin, and Rafael Cortina are the named inventors on the patents in suit.[4]

These patents resulted from the pioneering efforts of Messrs. Smith-Semedo, Blackman, Jacobs, Lupetin, and Cortina (hereinafter "the Inventors") in the area of customizable logging and content management for indexing multimedia, including a synchronized timer that provides a time reference upon request in connection with the media, and a logger that logs predefined events that occur in the media by associating the events with respective time references from the timer.

In the sports industry, for example, it can be very useful in scouting players to have the ability to search through an archive of recorded games to find particular events that occurred during the games. (*See* '010 patent at 1:28-36.) "The instant invention is designed to provide a management system for all types of recorded information . . . . (*See* '010 patent at 5:14-22.) "[T]he instant invention enables loggers to easily and efficiently view a live or prerecorded event and document a time-based stamp for predefined events that may occur . . . ." (*See* '010 patent at

---

[4] The '876 patent issued from a continuation application from the application that issued as the '010 patent. Their respective specifications are substantially identical, other than reference language up front. Reference herein to the '010 patent's specification likewise includes reference to the same language in the '876 patent's specification.

2:52-55.)

"[T]he invention includes a timer object and a logging object [and] . . . [t]he logger chooses the desired objects that are to be associated with the current time by, for example, clicking on the objects.  For example, as seen in FIG. 2 [of the '010 patent], the logger may select the 'player 1' and '2-point' buttons to log the fact that player 1 has made a 2-point shot in a basketball embodiment of the invention.  The system would then record, using the timer object, the particular point in time (relative or absolute) when this event occurred in the course of the overall event, thereby providing an index to the overall event for finding the logged 2-point event at a later time . . . . (*See* '010 patent at 5:23-50.)

"[A] user-friendly graphical user interface (GUI) is provided that is customized to the particular application (and optionally for each particular logger using the system) in which the system is being used.  The GUI includes user interface objects . . . that are used by the logger to record events.  The interface objects are predefined and customized for the particular asset being logged.  In other words, the GUI objects are defined so as to correspond with the typical types of events that are generally of interest for the particular overall event that is being logged.  . . .  The logged events are then stored in a database for later search and retrieval as desired." (*See* '010 patent at 2:55-3:6.)

An advantage of the patented inventions is that the system is easily customizable for any event that needs logging.  "[A] GUI generator may be provided that will enable the application to be customized automatically for any situation or event without the need to make coding modifications.  In other words, the system is preferably programmed to be customizable on the fly by enabling user interfaces to be automatically generated based on entered information by the user, thereby avoiding the need to hard code the interfaces.  This feature makes the invention very flexible and customizable because it is database driven."  (*See* '010 patent at 12:9:17.)  "[T[he GUI can easily be customized to fit any particular application . . . [and] a user interface generator is provided to facilitate the creation of customized, HTML- or XML-based user interfaces for the collection of standardized information."  (*See* '010 patent at 3:47-52.)  "With respect to the logging object, each user interface object corresponds to a data field that may be logged. These data fields are retrieved from a database of frequently logged fields. In accordance with the invention, this database is completely customizable . . . ."  (*See* '010 patent at 6:64-7:1.)

Thus, the invention allows the client to drive the application, the searchable database can be built on the fly based on radio buttons used, which cause the time code to start and stop in capturing each video clip, when radio buttons are used they can produce a text sentence producing a video clip permitting searches to take place

where the person can read exactly what the clip does, and the client has the ability to change or add a radio button in real time to capture events.

### 2. Defendants' Introduction

Plaintiff's general approach to claim construction is to disregard well-known and established principles of claim construction. As one of the busiest patent litigation districts, this Court is well-learned in claim construction basics. Yet Plaintiff insists on taking untenable positions lacking founding in those basics.

For example, Plaintiff seeks to limit the well-understood term "media" to a specific, single embodiment of media described in the '010 and '876 Patents without clear disavowal. This is improper. *See Thorner*, 669 F.3d at 1365 (claim terms "are generally given their ordinary and customary meaning" with "only two exceptions . . . (1) when a patentee sets out a definition and acts as his own lexicographer, or (2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."). Plaintiff also ignores arguments made during the prosecution of the '876 Patent to secure allowance of that patent's claims. This, too, is improper. *See Phillips*, 415 F. 3d at 1317 (an "invention is construed not only in the light of the claims, but also with reference to the file wrapper or prosecution history in the Patent Office") (internal quotation and citation omitted).

But perhaps the most blatant example of Plaintiff disregarding well-

established claim construction principles is its reliance on expert testimony to rewrite the express language of the claims and contradict intrinsic evidence. This is wrong because expert testimony is extrinsic evidence that takes a back seat to intrinsic evidence. *Id.* ("[W]hile extrinsic evidence can shed useful light on the relevant art, we have explained that it is less significant than the intrinsic record . . . .") (citations omitted). While expert testimony may be used to "ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art," expert testimony "is generated at the time of and for the purpose of litigation and thus can suffer from ***bias that is not present in intrinsic evidence***." *Id.* at 1318 (emphasis added). This bias is evident from Plaintiff's transparent and unsupported attempt to add unwarranted MPEG limitations to the claims and from Plaintiff's conclusory dismissal of Defendants' constructions. Expert testimony cannot be used to override the language of claims or the teachings of the specification. *See id.* ("[C]onclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court.").

Ultimately, as *Phillips* explains, extrinsic evidence "may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319. The situation here is no different. Here, "analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. . . . In [] cases [such as these] where the public

record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (internal citations omitted); *see also Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) ("*Vitronics* merely warned courts not to rely on extrinsic evidence in claim construction to contradict the meaning of claims discernible from thoughtful examination of the claims, the written description, and the prosecution history — the intrinsic evidence.") (emphasis in original).

Simply put, Plaintiff's expert declaration adds nothing. The court can ignore it because its focus should be squarely on the intrinsic evidence.

### B. The Parties' Positions on Terms 1-3, "a customizable media logging system for indexing media" (Term 1) and "media" or "the media" (Terms 2 and 3)

| Term Number and Claims | Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| Term 1<br><br>claim 1, 4, 5 and 8-10 of the '010 patent | "a customizable media logging system for indexing media" | a customizable media logging system that encodes video content in an MPEG stream format for indexing | No construction necessary – plain and ordinary meaning<br><br>Defendants propose a construction for "customizable media logging system." Defendants' proposed construction for that term is provided below. |
| Term 2 | "media" or "the media" | media in an MPEG stream format | No construction necessary – plain and ordinary meaning |

| Term Number and Claims | Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| claim 1, 5 and 8-9 of the '010 patent | | | |
| Term 3<br><br>claims 1, 2, 3, 5, 6, 9, 10 and 13 of the '876 patent | "media" or "the media" | media in an MPEG stream format | No construction necessary – plain and ordinary meaning |

### 1. Plaintiff's Opening Position on Terms 1-3

Patentee "clearly set forth a definition" in the specification and "clearly express[ed] an intent to define the term" in three instances, which should be construed as Plaintiff's advocate

### a. Term 1 ("a customizable media logging system for indexing media")

The first such term is the preamble to claim 1 of the '010 patent, which reads *a customizable media logging system* for indexing media" and is referenced again in the body of the claim as "*said media logging system* further including a graphical user interface generator."  The specification of the patents in suit plainly describe that the basic functions of *the claimed system include*: 1. *Capturing* linear (analog) and non-linear (digital) *video content*; 2. *Encoding the video content into MPEG format;* 3. Indexing each video frame, creating an electronic directory; 4. Storing

the video content as to facilitate customized retrieval, and 5. Re-broadcasting compressed video in digital quality."   (*See* '010 patent at 8:12-20.)  Thus, the specification indicates to a POSA that, in order to be a "customizable" system, as set for the in the term, the media logging system must encode the video content in MPEG stream format (step 2., above) for indexing each video frame (step 3.), which facilitates the "customized" retrieval of that video content (step 4.).  Plaintiff's proposed construction (a customizable media logging system that encodes video content in an MPEG stream format for indexing) captures this required definition set forth in the specification for the term "*a customizable media logging system* for indexing media."   Dr. Hernandez confirms this.  (*See* Hernandez at ¶¶ 39-40.) Plaintiff's proposed construction should be adopted by the Court.

> **b.    Terms 2 and 3 ("media" or "the media")**

The second and third such terms proposed for construction by Plaintiff are the same in both patents in suit, namely "media" and/or "the media."  The patents in suit state up front that "[i]t is noted that audio, video and other time-based media may simply be referred to as media in the description below, and that the invention is not limited to any particular media type."  (*See* '010 patent at 4:8-11.)  Thus, video is clearly defined to be interchangeable with media in the patents, and the above passage (*see* '010 patent at 8:12-20) requiring that the video content be encoded into MPEG format to facilitate the "customizable" system likewise applies to the term

media, which should be construed accordingly.  The requirement of this construction is also shown in additional passages in the specification, including  defining "[t]he video server" as "the heart of the video content management system," having certain requirements, including Requirement 5 which "[p]rovides broadcast-level quality with industry-standard-format digital video (this implies 6 Mb/s MPEG-2 streams)]" and implies "that the contents ***must be encoded in 6 Mb/s MPEG-2 streams*** with an MP@ML (Main Profile@Main Level) format defined in the standard for digital broadcasting and must be delivered without any conversion, such as digital to analog, in the transmission stage." (*See* '010 patent at 9:20-64; *see also* '010 patent at 1:13-25; 1:25-4:12; 4:13-5:6 (and all Figures); 5:6-7:37; 7:60-11:64; and 13:62-17:35)

Plaintiff's proposed construction (media in an MPEG stream format) captures the above required definition set forth in the specification for the term "media" and/or "the media," which is further confirmed by Dr. Hernandez.  (*See* Hernandez at ¶¶ 41-43.)  Dr. Hernandez further explains that MPEG-2 was the standard at the time of the filing of the application that led to the patents in suit, which has now evolved by several iterations to MPEG-4.  Thus, Plaintiff's proposed construction appropriately embraces all MPEG iterations (media in an MPEG stream format), and should be adopted by the Court.  (*See* Hernandez at ¶¶ 41-43.)

### 2.  Defendants' Answering Position on Terms 1-3

Plaintiff's argument regarding the media claim terms (Terms 1-3) is simple: since the specification describes a media logging system processing MPEG media, the only media falling with the scope of the claims is MPEG. But this is not how Courts interpret patent claims. The specification of a patent cannot "be used to rewrite[] the *chosen* claim language. 'Specifications *teach*. Claims claim.'" *SuperGuide Corp. v. DirecTV Enters., Inc*., 358 F.3d 870, 875 (Fed. Cir. 2004) (emphasis added) (citations omitted). Here, rewriting claims based on the specification is all Plaintiff offers. The Court should reject this approach.

### a.  Term 1 – "a customizable media logging system for indexing media"

Plaintiff argues that the claimed system must encode video content as an MPEG stream because "*the claimed system include[s] . . . [e]ncoding the video content into an MPEG format* . . . ." *See supra* at 13-14 (emphasis in original) (citing to '010 Patent at 8:12-20). Plaintiff describing this embodiment as "claimed"—complete with italic and bold emphasis—is highly misleading. Nowhere does the specification describe this embodiment as the "claimed" system. *See* '010 Patent at 7:61 ("Preferred Implementation Details"); *id.* at 8:12 ("The basic functions of the system . . . ."). Rather, the specification only uses the word "claimed" twice—neither of which are attached to Plaintiff's cited embodiment. Indeed, the first use directly contradicts Plaintiff's argument: "embodiments are only

exemplary and that the claimed invention is not meant to be limited to the specific embodiments described below." '010 Patent at 5:11-14. The second use merely leads into the claims and has no significance in interpreting them. '010 Patent at 17:43 ("What is claimed is: . . . ."). Plaintiff is simply incorrect that the "claimed system" is limited to indexing media in the MPEG media format.

Plaintiff's argument also ignores that the specification explicitly states that "media" can include audio-only embodiments and that the described system can handle "any particular media type." '010 Patent at 4:8-11 ("It is noted that *audio*, video *and other time-based media* may simply be referred to as *media* in the description below, *and that the invention is not limited to any particular media type*.") (emphasis added). Plaintiff's attempt to narrow "customizable media logging system" to a system that indexes only MPEG streams also conflicts with the specification describing that the logging system of the '010 Patent can index generic "digital video content" without further limitation. '010 Patent at 3:14-18 ("In accordance with another embodiment of the invention, a media management system is provided that accepts analog *or digital video content*, indexes the video content, indexes each video frame and provides for advanced retrieval of video segments of interest.") (emphasis added).

Ultimately, MPEG media is expressly only under "Preferred Implementation Details." '010 Patent at 7:61. Limitation of claims to a preferred embodiment is

improper, and the Court should reject Plaintiff's attempt to do so. *See Phillips*, 415 F.3d at 1323 (a fundamental tenant of claim construction is "to avoid . . . reading limitations from the specification into the claim"); *see also EPOS Techs. Ltd. v. Pegasus Techs. Ltd.,* 766 F.3d 1338, 1341 (Fed. Cir. 2014) ("[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited.") (citations omitted).

### b.    Terms 2 and 3 – "media" or "the media"

Plaintiff's arguments concerning Terms 2 and 3 are effectively the same as those it advances for Term 1 with the only difference being additional reference to specification embodiments. *See supra* at 14-15 (citing '010 Patent at 9:20-64 and 7:60-64 (all disclosure under the heading "Preferred Implementation Details")). Plaintiff otherwise arbitrarily cites additional portions of the specification with no explanation as to why those sections are relevant or why they justify narrowing "media" in the asserted claims to MPEG. *Id.* at 12 (citing '010 Patent at 1:13-25, 1:25-4:12, 4:13-5:6 (and all Figures), 5:6-7:37, 7:60-11:64, and 13:62-17:35). Plaintiff confuses the purpose of the specification. Its purpose is to "to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so," not to "improperly import[] limitations into the claims." *Cont'l Circuits LLC v. Intel Corp.,* 915 F.3d 788, 797 (Fed. Cir. 2019) (citations omitted).

Plaintiff cannot even hold itself to its own self-serving logic because while it seeks to limit the claims based on disclosed embodiments, it does not fully limit them to the specific embodiment the specification discloses: MPEG-2. Nearly all references to MPEG in the specification are to either MPEG-2 or MPEG-1. '010 Patent at FIG. 7b, FIG. 8c, FIG. 8f, FIG. 11 (the only reference to MPEG-1), 8:15 (the only "MPEG" reference), 9:40-57, 10:35-57, 11:10. To work around this, Plaintiff goes far out of its way to explain how after-arising versions of the MPEG standard are covered by the scope of the claims. *See supra* at 15 (discussing MPEG-4). This tenuous reliance on expert testimony would be unnecessary if the Plaintiff either followed well-known established claim construction principles or fully embraced its erroneous position that claims be limited to disclosed embodiments. The better approach—Defendants'—is to simply rely on the plain and ordinary meaning of "media" and not limit the word to MPEG streams only.

### 3.  Plaintiff's Reply Position on Terms 1-3

Defendants protest that Plaintiff is importing a limitation from the specification of the asserted patents by construing "media/the media" in Terms 1-3 as "media in an MPEG stream format."  However, in reviewing the intrinsic evidence, a POSA would understand that the words "media" and "the media" in Terms 1-3 of the asserted patents require a construction as "media in an MPEG stream format."

The specification of the asserted patent fully supports a reading of "media in an MPEG stream format" as an ***essential construction*** of "media" or "the media" in Terms 1-3. The specification describes the invention of the claimed system by specifying that the system's ***basic functions include***: "1. ***Capturing*** linear (analog) and non-linear (digital) ***video content***; 2. ***Encoding the video content into MPEG format;*** 3. Indexing each video frame, creating an electronic directory; 4. Storing the video content as ***to facilitate customized retrieval***, and 5. Re-broadcasting compressed video in digital quality." (*See* '010 patent at 8:12-20.) Thus, in order to be a "customizable" system, which a POSA would understand is a basic function of the invention, the media logging system must encode the video content in MPEG stream format (step 2., above) for indexing each video frame (step 3.), which facilitates the "customized" retrieval of that video content (step 4.).

In addition, the specification defines "[t]he video server" as "the heart of the video content management system," having certain requirements, including Requirement 5 which "[p]rovides broadcast-level quality with industry-standard-format digital video (this implies 6 Mb/s MPEG-2 streams)]" and implies "that the contents ***must be encoded in 6 Mb/s MPEG-2 streams*** with an MP@ML (Main Profile@Main Level) format defined in the standard for digital broadcasting and must be delivered without any conversion, such as digital to analog, in the transmission stage." (*See* '010 patent at 9:20-64.)

Moreover, not only is MPEG stream format a required construction for "media" or "the media" from the specification, it is the only embodiment that would disclose implementation of the claimed invention, particularly including the "customizable" aspect of the media logging system of that invention.   (*See* Hernandez at ¶¶41-43.)   Courts have found that, even when an embodiment is described as "non-limiting," a claim term may be construed according to the sole description in the patent when no other portion therein otherwise teaches what affirmative steps constitute the claimed method of a patent.  *See, e.g., The Medicines Company v. Mylan, Inc.*, 853 F.3d 1296, 1309 (Fed. Cir. 2017).   More particularly, there, the court concluded for a chemical mixing patent that:

> [O]ne of ordinary skill in the art would rely on Example 5 to ascertain the metes and bounds of 'efficiently mixing.'  As the only embodiment of efficient mixing, Example 5 is 'highly indicative of the scope of the claims.'   *Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1355 (Fed. Cir. 1998).  Example 5, however, is not merely the only disclosed embodiment of efficient mixing—it is the only description of efficient mixing in the patents in suit that casts light on what efficient mixing is and that enables one of ordinary skill in the art to achieve the objects of the claimed invention. Although the specification provides that Example 5 is "non-limiting," *e.g.*, '727 patent, col. 16 l. 6, no other part of the patents' written description sufficiently teaches the affirmative steps that constitute efficient mixing.  In this circumstance, we think it entirely appropriate to limit the term "efficiently mixing" to the sole portion of the specification that adequately discloses "efficient mixing" to the public. *See Alloc, Inc. v. ITC*, 342 F.3d 1361, 1370 (Fed. Cir. 2003);   *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1344–45 (Fed. Cir. 2001).

*The Medicines Company*, 853 F.3d at 1309.

Just as in *The Medicines Company*, the specification of the asserted patents only discloses one embodiment to "achieve the objects of the claimed invention," particularly the "customizable" aspect of the media logging system. *See above*. A POSA would look to the specification here and conclude that "a customizable media logging system for indexing media," "media or "the media" could only be construed to require that the recited media be in an MPEG stream format.

Thus, Term 1 from the preamble to claim 1 of the '010 patent, which reads "***a customizable media logging system*** for indexing media" and is referenced again in the body of the claim as "***said media logging system*** further including a graphical user interface generator," should be construed as "a customizable media logging system that encodes video content in an MPEG stream format for indexing." Terms 2 and 3, namely "media" and/or "the media," for the same reasons should be construed as "media in an MPEG stream format." Those constructions capture the required definitions set forth in the specification and explained above, particularly as to the "customizable" nature of the "***a customizable media logging system*** for indexing media." Dr. Hernandez confirms this. (*See* Hernandez at ¶¶ 39-43.)

Dr. Hernandez further explained that MPEG-2 referenced in the patents in suit was the standard at the time of their filing, which has now evolved by several iterations to MPEG-4. (*See* Hernandez at ¶43.) Thus, Plaintiff's proposed construction appropriately embraces all MPEG iterations (media in an MPEG stream

22

format).  Nevertheless, Defendants complain incorrectly that Plaintiff has ignored canons of claim construction and supposedly contradicted itself by construing "media/the media" as "media in an MPEG stream format," which includes all versions of MPEG, up to at least MPEG-4.  Defendants' argument makes no sense because MPEG-2 was the standard at the time the patent application was filed, so of course that was the version specifically identified in the specification.  A POSA would recognize that by describing MPEG-2, future versions of MPEG that include an MPEG stream format that enables the claimed invention would also be included and expected to develop and occur.  (*See* Hernandez at ¶¶41-43.)

Defendants simply criticize Dr. Hernandez's declaration without substantively addressing it.  However, in *Phillips*, the Federal Circuit explained that expert testimony can be used to:  provide the background of the technology at issue. Explain how an invention works; ensure that the court's understanding of the patent's technical aspects is consistent with that of a POSA; and establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field.  *See Phillips*, 415 F.3d at 1319; s*ee also Teva Pharms. USA,* 135 S. Ct. at 841. All of those reasons listed in *Phillips* as warranting consideration of expert testimony in claim construction fully apply to Dr. Hernandez's declaration, which should be considered especially as to proper construction and understanding of Terms 1-3.

Plaintiff acknowledged in its opening brief that the patents in suit state up

front that "[i]t is noted that audio, video and other time-based media may simply be referred to as media in the description below, and that the invention is not limited to any particular media type." (*See* '010 patent at 4:8-11.) Thus, audio, video and other time-based media are included with media in the patents. That does not undermine Plaintiff's construction of Terms 1-3 as Defendants argue because, for example, the MPEG stream format can certainly include audio as a POSA would know. Moreover, each video frame is also associated to some audio and other events that are indexed accordingly. The '010 patent shows how those indexes are created in FIGs. 8a-g, including other parameters, like text, or feature extraction from the video frames.

Defendants' citation to a single embodiment (*see* '010 patent at 3:14-18) that accepts "digital video content" as undermining Plaintiff's constructions of Terms 1-3 is equally unavailing, at least because there is no reference in that single citation to the "customizable" aspect of the invention that requires the MPEG stream format in those proposed constructions.

For all of the above reasons, Plaintiff's proposed constructions of Terms 1-3 should be adopted by the Court.

### 4.  Defendants' Sur-Reply Position on Terms 1-3

The parties agree on this: the specification of the at-issue patents explicitly states that "the invention is not limited to any particular media type." '010 Patent,

4:8-11. The specification also states "audio, video and other time-based media may simply be referred to as media" and that "embodiments are only exemplary and that the claimed invention is not meant to be limited to the specific embodiments described below." *Id.*, 4:8-11, 5:11-14. The specification is "highly relevant to the claim construction analysis," usually "dispositive" and "the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (internal citations and quotations omitted). Here, this "single best guide to the meaning of a disputed term" explicitly conflicts with Plaintiff's position.

Plaintiff still offers just two reasons for this Court to deviate from the teachings of the specification: (1) MPEG-2 is an example embodiment of media in the specification and (2) its hired expert Dr. Hernandez says "media" should be narrowly construed to MPEG-2.

**First**, Courts do not limit claim terms based on a preferred embodiment, even if it is the only one. *See EPOS Techs.*, 766 F.3d at 1341. There are only two exceptions—lexicography and disavowal—neither of which is present here. *Hill-Rom Servs., Inc. v. Stryker Corp.,* 755 F.3d 1367, 1371 (Fed. Cir. 2014). The standards for finding lexicography and disavowal are exacting, and disavowal requires the intrinsic evidence to make clear the invention does not include a particular feature. *Id.* Yet, Plaintiff cites nothing clear or exacting in the intrinsic evidence narrowing media to MPEG only. On the contrary, the specification is clear

and exacting that media is broad and that embodiments are non-limiting. '010 Patent, 4:8-11; 5:11-14.

Citing to *Medicines Company*, Plaintiff argues that even when a specification describes an embodiment as non-limiting, claims should be narrowed to that embodiment when no other portion of the specification provides a contrary example. Plaintiff's reliance on *Medicines Company* is misplaced.

There, the definition of "efficient mixing" was before the Federal Circuit. The at-issue patents provided an example of "inefficient mixing"—Example 4—and "efficient mixing"—Example 5. *The Meds. Co. v. Mylan, Inc.*, 853 F.3d 1296, 1308-09 (Fed. Cir. 2017). Example 5 provided "the specification's ***only clear delineation*** of what 'efficient mixing' is." *Id.* at 1309 (emphasis added). The patent owner also "relied on the mixing parameters of Example 5 to overcome prior art cited during prosecution and did not cite any other examples of efficient mixing." *Id.* Based on this, the Federal Circuit construed "efficient mixing" based on Example 5 because it was "the only *description* of efficient mixing . . . cast[ing] light on what efficient mixing is" and "no other parts of the patents' written description" described "efficient mixing." *Id.*

Here, the facts are entirely different. Unlike in *Medicines Company*, the specification of the patents at-issue here provides other descriptions and examples of media that are not MPEG, such as audio, analog video, "other time-based media,"

and "industry-standard-format digital video" which "implies," but is not limited to, MPEG. '010 Patent, 4:8-11 ("It is noted that audio, video and other time-based media may simply be referred to as media in the description below"); 3:7-13 ("In one embodiment of the invention, the system . . . log[s] or index[es] of linear (analog) video"); 9:40-42 (video server "[p]rovides broadcast-level quality with industry-standard-format digital video (this implies 6 Mb/s MPEG-2 streams)"). Also, unlike in *Medicines Company*, the patent owner did not rely on the MPEG format during prosecution to secure an allowance. 853 F.3d at 1309. The lack of other examples and arguments made during prosecution were the reason the Federal Circuit used a specific embodiment to define "efficient mixing." *Id.* That is simply not the case here and *Medicines Company* is irrelevant.

**Second**, relying on expert testimony to rewrite unambiguous and easily understood language is improper. While expert testimony can be useful to a court, its purpose is to ensure the Court's understanding of particularly technical aspects of the invention. *See Phillips*, 415 F.3d at 1318. Here, the word "media" is readily apparent, and its construction should involve little more than applying its widely understood meaning. *See id.* at 1314. There is no need for the Court to rely on an expert here.

While Defendants did not substantively attack Dr. Hernandez's testimony from a technical standpoint, they need not do so. This is so because expert

27

testimony—like all extrinsic evidence—is not part of the patent and less reliable. Here, expert testimony is especially unreliable because it is "clearly at odds" with the specification. *See id.* at 1318. Dr. Hernandez's testimony narrows "media" to MPEG format only, yet the specification is unambiguous that "the invention is not limited to any particular media type." '010 Patent, 4:8-11. The Court should reject Plaintiff's attempt to rewrite the claims based on expert testimony conflicting with the express teachings of the specification. *Phillips*, 415 F.3d at 1318.

### C. The Parties' Positions on Terms 11, 13, 14, 17, 19, 20 and 21, "customizable" and "custom"

| Term Number and Claims | Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| Term 11<br><br>claim 1 of the '010 patent | "customizable media logging system" | No construction necessary, but see below construction for "a customizable media logging system for indexing media" | "changeable media logging system that can be changed on the fly by the customer" |
| Term 13<br><br>claim 1 of the '010 patent | "wherein the graphical user interface is customizable to correspond to types of events that occur in the particular media being logged" | No construction necessary | "wherein the graphical user interface is changeable on the fly by the customer to correspond to types of events that occur in the particular media being logged" |

28

| Term Number and Claims | Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| Term 14<br><br>claim 1 of the '010 patent | "custom graphical user interface including custom user interface objects" | No construction necessary | "the graphical user interface can be changed on the fly by the customer [to include user interface objects changeable by the customer]" |
| Term 17<br><br>claim 1 of the '876 patent | "events administrator programmed logic circuitry . . . configured to define custom terminology applicable to the defined custom event" | No construction necessary | "configured to allow a customer to define custom terminology applicable to the defined custom event" |
| Term 19<br><br>claim 1 of the '876 patent | "wherein the events administrator programmed logic circuitry is customizable by a user based in part on the type of media being indexed" | No construction necessary | "wherein the events administrator programmed logic circuitry is changeable on the fly by a customer user based in part on the type of media being indexed" |
| Term 20<br><br>claim 5 of *the '876* patent | "wherein the graphical user interface is customizable to correspond to types of events that occur in the | No construction necessary | "wherein the graphical user interface is changeable on the fly by the customer to correspond to types of events that occur in the particular media being logged" |

| Term Number and Claims | Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| | particular media being logged" | | |
| Term 21<br><br>claim 13 of the '876 patent | "custom display" | No construction necessary | "display can be changed on the fly by the customer" |

### 1. Plaintiffs' Opening Position on Terms 11, 13, 14, 17, 19-21

"District courts are not (and should not be) required to construe *every* limitation present in a patent's asserted claims." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,* 521 F.3d 1351, 1362 (Fed. Cir. 2008) (Emphasis original). The Federal Circuit "has repeatedly held that a district court is not obligated to construe terms with ordinary meanings . . . ." *Id.* at 1360.

Here, none of Defendants' twelve challenged terms requires construction. These terms do not have any specialized meaning in the art or in the context of the patents in suit. The patentee did not give any of these terms a different meaning in the specification or during prosecution, or disclaim or disavow any claim scope. All twelve terms are perfectly clear, without any special construction.

These twelve terms and each of the words that comprise them do not have any specialized meaning in the art or in the context of the patents in suit. The words and

the terms as a whole are clear from their plain language.  Defendants' proposed constructions, on the other hand, simply rewrite the terms in an arbitrary fashion, which is neither required nor supported by the intrinsic evidence.  (*See* Hernandez at ¶¶ 50-51.)

The words in these terms are common ones that are used as they are normally understood in plain English: for example, "timer object," "GUI generator," "custom," and "circuitry."  Nothing in these words themselves, nor in the way that they are strung together within the claim terms, requires explanation to either a POSA or a layperson.  (*See* Hernandez at ¶¶ 50-51.)  The Defendants cannot contend that the specification sets forth an express definition for each phrase that would differ from its ordinary meaning.  Likewise, Defendants cannot argue that the patent applicants disclaimed any subject matter in prosecution.  Instead, Defendants commit a classic error that is regularly seen with result-oriented constructions, that of merely substituting selected words for those actually recited.  The Defendants crafted proposed constructions from whole cloth, without any basis in the claims themselves.

For six of the twelve above terms (numbered 11, 13, 14 from the '010 patent and 19-21 from the '876 patent), Defendants propose incorporating the terms "changeable," "customizable" or "changed" "on the fly by the customer" with respect to the recited media logging system (term 11), logic circuitry (term 19), GUI

(terms 13, 14 and 20) or custom display (term 21).  As for Term 17, Defendants include a "customer" doing the defining, by proposing a construction of  "configured to allow *a customer to define* custom terminology applicable to the defined custom event.  However, the words "on the fly by the customer" and allowing a "customer to define" do not appear anywhere in the claim language, and there is nothing in the intrinsic record that requires their incorporation into these claims.  Defendants simply selected those words and improperly imported them into the claims.  In fact, no construction is necessary for any of these terms, given the clarity of their plain language.  The plain and ordinary meaning of these claim terms is all that is required. (*See* Hernandez at ¶¶ 52.)

## 2.  Defendants' Answering Position on Terms 11, 13, 14, 17 and 19-21

Plaintiff's Opening Brief fails to substantively address any of Defendants' constructions and instead submits conclusory arguments that all of Defendants' terms are understood by a person of ordinary skill in the art ("POSA") or otherwise unjustifiably criticizes the format of Defendants' constructions that actually follow the language from the intrinsic record.

Defendants' proposed constructions for the "customizable" and "custom" terms seek to clarify what the patentee intended to cover: a media logging system that can be changed by a customer "on the fly." While the Court need not provide an explicit construction for every word in a patent claim, the meaning of "custom"

and "customizable" is a key issue in this dispute that requires the Court to provide a specific construction. *O2 Micro*, 521 F.3d at 1361 ("A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute.").

Moreover, Plaintiff's "no construction necessary" approach to the "custom" terms ignores that customization was *the* core claim feature leading to allowance. Without a specific construction from the Court, the claims are susceptible to being interpreted to capture media logging systems the patentee did not claim or intend to claim. Ultimately, "the court's obligation is to ensure that questions of the scope of the patent claims are not left to the jury." *Every Penny Counts, Inc. v. Am. Express Co.*, 563 F.3d 1378, 1383 (Fed. Cir. 2009); *see also O2 Micro*, 521 F.3d at 1360 (noting that "[w]hen the parties raise an actual dispute regarding the proper scope of [the] claims, the court, not the jury, must resolve that dispute"). Resolution of the parties' dispute concerning the scope of "custom" and "customizable" as used in the claims is appropriate.

Interestingly, Plaintiff appears to agree with Defendants about the scope of customizable. For example, Plaintiff acknowledges in its introduction that the claimed "invention" is one where a client user can change a user interface "on the fly":

> Thus, ***the invention allows the client to drive the application***, the searchable database can be built *on the fly* based on radio buttons used, which ause [sic] the time code to start and stop in capturing each video clip, when radio buttons are used they can produce a text sentence producing a video clip permitting searches to take place where the person can read exactly what the clip does*, **and the client has the ability to change or add a radio button in real time to capture events***.

*Supra* at 9-10 (emphasis added). Defendants' proposed constructions capture what Plaintiff describes as the "advantage of the patented inventions," one where "the system is easily customizable for any event that needs logging." *See supra* at 9. Plaintiff's challenge to Defendants' proposed constructions of the custom claim terms is untenable given that Plaintiff's description of the invention and its advantages are wholly consistent with what Defendants have proposed.

More important, however, is the intrinsic record of the '010 and '876 Patents. Courts start with the specification because it is "the single best guide to the meaning of a disputed term." *See Phillips*, 415 F.3d at 1315 (citations omitted). "It is axiomatic that the claim construction process entails more than viewing the claim language in isolation. Claim language must always be read in view of the written description . . . to capture the scope of the actual invention, rather than . . . allow the claim language to become divorced from what the specification conveys is the invention." *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011).

Here, the specification is consistent with Defendants' proposed constructions.

It describes a customizable interface that allows "the client to drive the application."[5]

The specification states:

> In other words, the system is preferably programmed to be ***customizable on the fly*** by enabling user interfaces to be automatically generated based on entered information by the user, thereby avoiding the need to hard code the interfaces. This feature makes the invention very flexible and customizable because it is database driven.

'010 Patent at 12:12-17 (emphasis added).

> Preferably, the user interface objects are ***customizable on the fly***, as well. For example, a blank field at the bottom of each grouping may be provided to allow the logger to type the customized field, add the field to the database of fields, and log the event using that customized field.

'010 Patent at 7:9-13 (emphasis added).

> As shown in FIG. 41, Events Administration permits the administrator or logger to customize the logging application with their own special terminology. For example: the button "2 pt. Shot" can be changed to "jumper". Or "dunk" can be customized to say "Jam!" Preferably, every item on the application is totally customizable, allowing the user total freedom to record a sporting event, fashion show, courtroom proceeding, or any desired A/V event.

'010 Patent at 16:42-49.

What the specification conveys is that the customization within the context of

the invention is one where a user can change the graphical user interface "on the fly"

without the need to hard code the user interfaces.

_____

[5] The phrase allowing "the client to drive the application" is Plaintiff's characterization of the claims. *Supra* at 9. Again, this is wholly consistent with Defendants' proposals.

The meaning of custom and customizable was also important during prosecution of the application leading to the '876 Patent. When a patentee limits the scope of a claim term to overcome a prior art rejection, "the doctrine of prosecution history disclaimer narrows the meaning of the claim consistent with the scope of the claim surrendered." *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013). Prosecution disclaimer "preclude[s] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). Such disclaimer can occur through amendment or argument. *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).

Here, arguments made during the prosecution of the application leading to the '876 Patent show that the patentee and the USPTO understood the "invention" to be a customizable system allowing the user to drive the application by changing things "on the fly":

> customized with special terminology, for example. This feature in certain exemplary instances advantageously allows the same system to log the same and/or different media and/or events in multiple, customizable ways. Thus, the invention of the claims allows

> for flexible logging among and/or between events, at least insofar as the type of media itself as well as the events that occur during the media can be custom defined. In addition

'876 Prosecution History, Exh. 5 at CSE000514-15.

36

terminology. Applicant's claimed invention, which enables customized, changeable terminology to be used with a single sport or with a wide variety of sports, is a marked improvement over the need for separate, sport-specific applications that each have fixed terminologies.

'876 Prosecution History, Exh. 5 at CSE000467.

In a nutshell, none of the prior art of record, alone or in combination, provides Applicant's claimed arrangements of technical features. For example, none of the prior art, alone or in combination enables a user to use a single system across multiple sports industries to provide a fully changeable, fully customizable sport-specific terminology such that it corresponds with the sport's vernacular and/or preferred nomenclature.

'876 Prosecution History, Exh. 5 at CSE000468.

However, Applicant's claimed invention is completely unlike these prior art techniques. For example, none of the prior art, alone or in combination enables a user to use a single system across multiple sports industries to provide a fully changeable, fully customizable sport-specific terminology such that it corresponds with the sport's vernacular and/or preferred nomenclature. That is, none of the prior art, alone or in

'876 Prosecution History, Exh. 5 at CSE000447.

Defendants' proposals appropriately track language from the specification and the prosecution history. For example, Defendants propose to construe "wherein the graphical user interface is customizable to correspond to types of events that

occur in the particular media being logged" as "wherein the graphical user interface is *changeable on the fly by the customer* to correspond to types of events that occur in the particular media being logged." This is directly consistent with the above quoted portions of the specification, patentee's statements during prosecution, and Plaintiff's own summary understanding of its "invention." *See supra* at 9-10.

The Court should adopt Defendants' proposals for the "customizable" and "custom" terms to clarify the scope of the claims and confirm the claims apply to logging systems that are changeable on the fly by the client as patentee intended.

### 3.  Plaintiff's Reply Position on Terms 11, 13, 14, 17 and 19-21

An important first step is to consider whether there are any of Terms 11-22 (including Terms 11, 13, 14, 17, 19, 20 and 21 relating to "custom" or "customizable") that actually need construction and, further, what is the Defendants' motivation in proposing these simple, readily-understood terms for construction. Indeed, "[d]istrict courts are not (and should not be) required to construe *every* limitation present in a patent's asserted claims."  *O2 Micro*, 521 F.3d at 1362 (Emphasis original).  The Federal Circuit "has repeatedly held that a district court is not obligated to construe terms with ordinary meanings, lest trial courts be inundated with requests to parse the meaning of every word in the asserted claims."  *Id.* at 1360; *see also Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010).

In short, "although every word used in a claim has a meaning, not every word requires a construction." *Orion IP, LLC v. Staples, Inc.*, 406 F. Supp. 2d 717, 738 (E.D. Tex. 2005). Here, none of the disputed Terms 11-22 requires construction. These terms do not have any specialized meaning in the art or in the context of the patents in suit. The patentee did not give any of these terms a different meaning in the specification or during prosecution, or disclaim or disavow any claim scope. Instead, all of Terms 11-22 are perfectly clear and understandable to a POSA as they stand, without any special construction. No construction of any of Terms 11-22 is necessary, and they should be given their plain and ordinary meanings.

Nevertheless, Defendants argue that their proposed constructions for "customizable"/"custom" (Terms 11, 13, 14, 17, 19, 20 and 21) are offered to "clarify what the patentee intended to cover: a media logging system that can be changed by a customer 'on the fly.'" In actuality, under the guise of "clarifying," Defendants are improperly attempting to make "on the fly" a requirement of a "custom" or "customizable" system as recited in the claims. To prop up their argument, Defendants contend that customization was "the core" feature leading to allowance of the claims. Even if that were the case, there is nothing in the plain language of the claims, much less even in the specification or prosecution histories of the patents in suit, to support Defendants' improper rewriting of these terms to include the system being changeable "on the fly" by a customer.

In the first instance, Plaintiff certainly does not agree with Defendants' position that "on the fly" should be incorporated into any of the "customizable" or "custom" terms.  Rather, in the Background of the Technology section (*supra* at 7-10), Plaintiff cited to a part of the '010 patent that states:  "the system is ***preferably programmed to be customizable on the fly*** by enabling user interfaces to be automatically generated based on entered information by the user, thereby avoiding the need to hard code the interfaces.  This feature makes the invention very flexible and customizable because it is database driven."  (*See supra at 9, citing* '010 patent at 12:9:17.)  Plaintiff later summarized the same preference language in the same opening brief section (*supra* at 9-10).  A preference is not a requirement, however, and there is no requirement to incorporate the "on the fly" language into these terms.

Even the Defendants' citations to the specification in their opening section of this brief likewise describe "on the fly" customization as a preference and not a requirement.  (*see* Defendants' citation to '010 patent at 12:12-17 [using the words "preferably programmed" to be customizable "on the fly"] and 7:9-13 [using the word "Preferably" relative to user interface objects being customizable "on the fly"].)  Defendants' other citation to the specification as supposed support for its argument does not even reference "on the fly" language, but again does indicate that only "[***p]referably***, every item on the application is totally customizable . . . ."  (*See* Defendants' citation to '010 patent at 16:42-49.)

Notably, Defendants argue that the "customizable" and "custom" terms require the system to be changeable "on the fly" by a ***customer***, but that term does not appear anywhere in any of the claims of the patents in suit and, indeed, appears only once in the specification of those patents with reference to Fig. 18, not customization.   Rather, the claims either use the term "user" with respect to customization (*see, e.g.,* claim 1, '010 patent; "wherein the graphical user interface generator uses information entered by a user to create the customized user interface") or they are open as to who or what is doing the customizing (*see, e.g.,* claim 1, '010 patent, "wherein the graphical user interface is customizable").  In either case, none of the claims requires that the user be ***a customer*** using the system to make changes on the fly, as in Defendants' proposed constructions of Terms 11, 13, 14, 17, 19, 20 and 21.

The prosecution history also does not support Defendants' effort to incorporate "on the fly" language into these terms.  Defendants cite to four separate parts of the prosecution history in their opening brief (*see supra,* at 36-37) (citing Ex. 5 at CSE 514-15, 467, 468 and 447, in that order), none of which uses or even references the "on the fly" language Defendants seek to import into the claims.

The patentee did not give any of Terms 11, 13, 14, 17, 19, 20 and 21 relating to "customizable" or "custom" a different meaning in the specification or during prosecution, or disclaim or disavow any claim scope during prosecution.  Instead,

all of these terms are perfectly clear and understandable to a POSA as they stand, without any special construction.  No construction of any of Terms 11, 13, 14, 17, 19, 20 and 21 is necessary and they should be given their plain and ordinary meaning to a POSA.  (*See* Hernandez at ¶¶ 50-54.)

### 4.   Defendants' Sur-Reply Position on Terms 11, 13, 14, 17 and 19-21

This Court should issue a construction for the "customizable" and "custom" claim terms because the scope of these terms is a key issue in dispute. Plain and ordinary meaning is inadequate when relying on it will not resolve the parties' dispute. *See O2 Micro*, 521 F.3d at 1361. That is the case here.

Plaintiff's response on the "customizable" and "custom" claim terms never addresses that Plaintiff described "the invention" of the at-issue patents to be a media logging system that "allows the ***client*** to drive the application, the searchable database can be built ***on the fly*** based on radio buttons used . . . and the client has the ability to change or add a radio button in real time to capture events." *Supra* at 9-10.

Plaintiff also ignores arguments made before the Patent Office essentially equating "customizable" with "on the fly," and identifying this aspect of the invention as a key difference over cited prior art. For example, in addition to the arguments cited by Defendants in their Response above, Plaintiff also made the following argument in the November 5, 2008 Appeal Brief filed in the application

leading to the '876 Patent:

> Just as separate paper score sheets must be created for different sporting events, **Bohn's electronic device needs to be reprogrammed** for different sporting events. Furthermore, once a paper score sheet or Bohn's programming is fixed, a scorekeeper cannot alter it. For example, **terms cannot be added, deleted, or changed "on the fly,"** ...
>
> However, **Applicant's claimed invention is completely unlike these prior art techniques**... In essence, certain exemplary embodiments of Applicant's **claimed invention** not only allow a user to fill-in a score sheet, they also allow the user to create a very specific, **highly customized score sheet in the first place**.

Ex. 5 at CSE000446-447 (emphasis added). Plaintiff cannot walk away from the arguments it made to secure an allowance. *See Cordis Corp. v. Medtronic Ave, Inc.*, 511 F.3d 1157, 1177 (Fed. Cir. 2008).

The argument above is clear and unmistakable and narrows the scope of "custom" and "customizable." Changes to score sheets in the prior art systems require reprogramming because they are fixed and cannot be changed "on the fly" by a user. But the claimed invention is "completely unlike" this prior art because it is "fully customizable" and "allow[s] the user to create a very specific, highly customized score sheet." Ex. 5 at CSE000446-447. The applicant expressly linked "changed on the fly" with "customized" during prosecution which is why Defendants use "changeable on the fly" in its proposed construction of "custom" and "customizable."

### D. The Parties' Positions on Terms 15, 16 and 22, "graphical user interface generator"

| Term Number and Claims | Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| Term 15<br><br>claim 1 of the '010 patent | "wherein the graphical user interface generator uses information entered by a user to create the customized user interface" | No construction necessary | "wherein the graphical user interface generator uses information entered by a customer user to create the changeable user interface as defined by the customer [avoiding the need to hard code the interfaces]" |
| Term 16<br><br>claim 1 of the '010 patent | "graphical user interface generator" | No construction necessary | "graphical user interface software as a graphical user interface generator" |
| Term 22<br><br>claim 13 of the '876 patent | "a GUI generator" | No construction necessary | "graphical user interface software as a GUI generator" |

### 1. Plaintiff's Opening Position on Terms 15, 16 and 22

Defendants also propose rewriting each of these three terms from the '010 patent (Terms 12 and 15) and the '876 patent (Term 16). Specifically, Defendants inserted the following, highlighted language into these six terms, respectively: (Term 15) "wherein the graphical user interface generator uses information entered

by a *customer* user *to create the changeable user interface as defined by the customer [avoiding the need to hard code the interfaces];"* (Term 16) "graphical user interface *software as a graphical user interface* generator;" and (Term 22) "graphical user interface **software as a GUI** generator."

The above words Defendants inserted in their proposed constructions do not appear anywhere in the claim language of these terms, and there is nothing in the intrinsic record that requires their incorporation into these claims. Rather, Defendants simply selected those words and improperly imported them into the claims. In fact, no construction is necessary for any of these terms, given the clarity of their plain language. The plain and ordinary meaning of these claim terms is all that is required. (*See* Hernandez at ¶¶ 53-54.)

## 2. Defendants' Answering Position on Terms 15, 16 and 22

Just like all the other terms discussed above, the specification is the Court's guide to an appropriate understanding of the claimed "graphical user interface generator." *Vitronics Corp.*, 90 F.3d at 1582 (stating that the specification "is always highly relevant to the claim construction analysis"). "Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* One way the specification can inform claim construction is through a disavowal, which requires that "the specification make[] clear that the invention does not include a particular feature." *SciMed Life Sys.,* 242 F.3d at 1341.

The specification's relevant disavowal is in the form of two mutually exclusive mechanisms for producing a user interface: (1) hard coding modifications or (2) using of a graphical user interface generator:

> The user interface may be **hard coded** for each application in which the invention is being used. For example, … the user interface can be **hard coded to provide the appropriate buttons and other interface objects that correspond to the types of events that one would desire to log in connection with the particular sporting event**.
>
> …
>
> **On the other hand**, in accordance with another aspect of the invention, **a GUI generator** may be provided that will enable the application to be customized automatically for any situation or event **without the need to make coding modifications**. In other words, the system is preferably programmed to be customizable on the fly by enabling user interfaces to be automatically generated based on entered information by the user, **thereby avoiding the need to hard code the interfaces**.

'010 Patent at 11:65-12:17 (emphasis added).

Given that (1) hard coding modifications and (2) using a graphical user interface generator are disclosed as mutually exclusive alternatives, a POSA would consider each excluded from the scope of the other.

And the specification goes even further by disparaging hard coding modifications in favor of a graphical user interface generator to facilitate "customiza[tion] on the fly"—the very essence of what Plaintiff's Brief describes as the "invention." The specification does so by stating that a graphical user interface generator "will enable the application to be customized . . . **without the need to make coding modifications . . . thereby avoiding the need to hard code the**

46

*interfaces*." '010 Patent at 12:9-16 (emphasis added). Much like all the other well-settled claim construction principles applied by Defendants, disparaging alternatives to a specific embodiment has been used as a basis for courts to limit a claim element to the specific embodiment. *See, e.g.*, *Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1372 (Fed. Cir. 2012); *Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*, 450 F.3d 1350, 1354-55 (Fed. Cir. 2006).

Beyond the disavowal, Patentee also acted as its own lexicographer by "clearly set[ting] forth a definition of the disputed claim term" and by "clearly express[ing] an intent to redefine the term." *Thorner*, 669 F.3d at 1365 (internal quotation and citation omitted). The specification defines "a graphical user interface generator" as enabling "the system . . . to be customizable on the fly by enabling user interfaces to be automatically generated based on entered information by the user," which is yet another reason to exclude hard coding modifications from its scope.

Defendants' proposals for the "graphical user interface generator" terms comport to the specification by using language concerning "avoiding the need to hard code the interfaces" for Term 15. Likewise, the proposals for Terms 16 and 22 clarify that the claimed "graphical user interface generator" is itself *graphical* software, consistent with the specification's description of the "invention" that avoids inflexible hard coded interfaces.

### 3.  Plaintiff's Reply Position on Terms 15, 16 and 22

According to Defendants, the specification of the '010 patent provides a clear disavowal of subject matter because it recites two supposedly mutually exclusive mechanisms for producing a user interface, namely hard coding modifications or using a graphical user interface generator.  There is no such mutual exclusivity described in the patents in suit, including in the part cited by Defendants (*i.e.,* '010 patent at 11:65-12:17), which states:

> The user interface may be hard coded for each application in which the invention is being used. . . . Of course, each sport would have different needs. Thus, the system could be manually recoded to provide the appropriate customized interface for each application. . . .

> On the other hand, ***in accordance with another aspect of the invention***, a ***GUI generator may be provided that will enable the application to be customized automatically*** for any situation or event ***without the need to make coding modifications***. In other words, the system is ***preferably programmed to be customizable on the fly by enabling user interfaces to be automatically generated based on entered information by the user***, thereby avoiding the need to hard code the interfaces. This feature makes the invention very flexible and customizable because it is database driven.

Thus, the patent in the above passage describes a GUI generator as ***another aspect*** of the invention, not a different embodiment, and further states that the system is "***preferably programmed***" to be customizable on the fly based on information entered by the user.  There is no mutual exclusivity between two mechanisms, much less a requirement for "on the fly" changeability by a user.

Likewise, there is no disparagement of "hard coding modifications" in the

patents in suit, as Defendants wrongly urge in citing to the '010 patent at 12:9-16.

Once again, what Defendants describe as disparagement, is actually a description of

*a preference* and simply *another aspect* of the invention (in accordance with

*another aspect of the invention*, a GUI generator may be provided that will enable

the application to be customized . . . without the need to make coding modifications.

In other words, *the system is preferably programmed* to be customizable on the fly

. . . thereby avoiding the need to hard code the interfaces.")  For the same reasons,

patentee did not act as its own lexicographer in reciting in the same passage that the

"system is *preferably programmed* to be customizable on the fly by enabling user

interfaces to be automatically generated based on entered information by the user,"

which is a statement of preference not an act of lexicography.  (*See* '010 patent at

12:9-16.)  Tellingly, Defendants left out the "preferably programmed language"

from the above patent cite in wrongly arguing that the patentee acted as its own

lexicographer.  Plaintiff did not.

Expressions of a preference are not a restriction or lexicography, much less a

requirement to rewrite the claims as proposed by Defendants.  There is no basis to

rewrite Term 15 to recite that "the graphical user interface generator uses

information entered by a customer user to create the changeable user interface as

defined by the customer [avoiding the need to hard code the interfaces]."  As noted

in above section B., there is no such thing as a customer user and avoiding hard

coding the interfaces is merely a preference, not a requirement.

Indeed, while disavowal can be effectuated by language in the specification or the prosecution history, *see Phillips*, 415 F.3d at 1316−17, the standard for disavowal is exacting, requiring clear and unequivocal evidence that the claimed invention includes or does not include a particular feature. *See Openwave Sys., Inc. v. Apple Inc*., 808 F.3d 509, 513−14 (Fed. Cir. 2015); *Omega*, 334 F.3d at 1323−26. Ambiguous language cannot support disavowal. *Omega*, 334 F.3d at 1324; *see also Schindler Elevator Corp. v. Otis Elevator Co.*, 593 F.3d 1275, 1285 (Fed. Cir. 2010). The above disclosure is far from the required "clear and unequivocal evidence that the claimed invention includes or does not include a particular feature." There is no such clear and unequivocal evidence that any of Terms 15, 16 and 22 includes or does not include a particular feature, particularly the ones suggested by Defendants in their proposed construction of those terms.

With respect to Terms 16 and 22, there is nothing in the specification of the patents in suit that recites or makes any reference to "graphical user interface software," and of course that language is not in the claims either. There is no basis for Defendants to rewrite those terms using that language.

The patentee did not give any of Terms 15, 16 and 22 relating to "a graphical user interface generator" a different meaning in the specification or during prosecution, or disclaim or disavow any claim scope during prosecution. Instead,

all of these terms are perfectly clear and understandable to a POSA as they stand, without any special construction.  No construction of any of Terms 15, 16 and 22 is necessary. and they should be given their plain and ordinary meaning to a POSA. (*See* Hernandez at ¶¶ 50-54.)

### 4.  Defendants' Sur-Reply Position on Terms 15, 16 and 22

Plaintiff's Reply Brief misunderstands the specification of the '010 Patent. According to Plaintiff, (1) hard coding modifications and (2) using a GUI generator are not mutually exclusive mechanisms for producing a user interface. Plaintiff asserts that the specification describes a GUI generator as "*another aspect* of the invention, not a different embodiment" when considering the disclosure concerning hard coding modifications. Plaintiff is wrong.

In discussing the generation of its GUI, the specification states:

> The user interface may be ***hard coded*** for each application in which the invention is being used. For example, if the system of the instant invention is designed for a sports application, ***the user interface can be hard coded to provide the appropriate buttons and other interface objects that correspond to the types of events that one would desire to log in connection with the particular sporting event***. Of course, each sport would have different needs. Thus, ***the system could be manually recoded to provide the appropriate customized interface for each application***.

'010 Patent, 11:65-12:7 (emphasis added).

In the next paragraph, the specification explains the mutual exclusive option of a GUI generator:

> ***On the other hand***, in accordance with another aspect of the invention, ***a GUI generator may be provided that will enable the application to be customized automatically for any situation or event*** ***without the need to make coding modifications***. In other words, the system is preferably programmed to be customizable on the fly by enabling user interfaces to ***be automatically generated based on entered information by the user,*** ***thereby avoiding the need to hard code the interfaces***.

'010 Patent, 12:8-17 (emphasis added).

A POSA would readily understand that (1) the GUI "may be hard coded for each application in which the invention is being used," ***or*** (2) "a GUI generator may be provided that will enable the application to be customized automatically." The POSA would further recognize that there is no hard coding in the presence of a GUI generator as described by the specification, and there is likewise no GUI generator in the presence of hard coding. It logically follows that hard coding modifications and the GUI generator are necessarily mutually exclusive alternatives.

Plaintiff's argument that the above specification language "is actually a description of ***a preference*** and simply ***another aspect*** of the invention" and thus cannot serve as a basis for two mutually exclusive mechanisms is unfounded in the law. Defendants acknowledge that the GUI generator is expressed as a preference – however, the GUI generator is a preferred exclusive alternative that was ***actually claimed***.

It is well-settled that preferred embodiments do not necessarily act as claim limitations. *See, e.g.*, *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed.

Cir. 2004). However, while claims are not necessarily restricted in scope to what is shown in a preferred embodiment, "neither are the specifics of the preferred embodiment irrelevant to the correct meaning of claim limitations." *Phonometrics, Inc. v. N. Telecom Inc.*, 133 F.3d 1459, 1466 (Fed. Cir. 1998).

Specifically, "when the invention as claimed covers only the preferred embodiment described in the written description, it is questionable whether a patentee may assert a proposed construction that is broader than the plain language of the claim." *Apple Inc. v. Andrea Elecs. Corp.*, 949 F.3d 697, 707 (Fed. Cir. 2020); *see also Liebel-Flarsheim Co.*, 358 F.3d at 913 ("[I]t is improper to read limitations from a preferred embodiment … into the claims ***absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited***.") (emphasis added).

Here, while the GUI generator is described as a "preferred embodiment" in the text of the '010 Patent, it is also plainly recited in the text of the actual claims.

Plaintiff also fails to identify any disclosure to respond to the specification's disparagement of hard coding modifications in favor of a GUI generator. And instead attempts general reliance on case law that actually supports Defendants' position.

In *Openwave*, the district court construed three claim terms: "mobile device," "wireless mobile telephone," and "two-way communication device." *Openwave*,

808 F.3d at 511. The issue was whether the disputed terms covered mobile devices that contain a "small microcontroller" in order to facilitate communications, or whether the claims are broader and encompass mobile devices including a "computer module." *Id.* at 512. The district court determined that statements in the specification clearly disparaged mobile devices containing computer modules and thus found that there was a disavowal of such subject matter by the patentee. *Id.* at 512-13. In affirming the district court, the Federal Circuit observed that the specification was "rife" with "remarks that disparage and, therefore, disclaim mobile devices that incorporate computer modules." *Id.* at 514. Just as the situation here.

In *Omega* and *Schindler Elevator*, the Court only addressed the doctrine of prosecution history disclaimer, which is irrelevant to Defendants' specification-based disavowal argument.

Nonetheless, Defendants emphasize that there is no ambiguity in this case that may save the '010 Patent from disavowal of claim scope. The specification clearly and unmistakably disparages hard coding modifications in favor of a graphical user interface generator to facilitate "customiza[tion] on the fly"—the very essence of what Plaintiff's Opening Brief described as the "invention." The specification does so by stating that a graphical user interface generator "will enable the application to be customized . . . ***without the need to make coding modifications . . . thereby avoiding the need to hard code the interfaces***." '010 Patent, 12:9-16 (emphasis

added). Disparaging alternatives to a specific embodiment has been used as a basis for courts to limit a claim element to the specific embodiment.

### E. The Parties' Positions on Terms 12 and 18, "timer object"

| Term Number and Claims | Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| Term 12 claim 1 of the '010 patent | "a timer object that provides a time reference upon request in connection with the media" | No construction necessary | "a timer object that provides the amount of the media that has been captured upon request in connection with the media" |
| Term 18 claim 1 of the '876 patent | "a timer object configured to provide a time reference upon request in connection with the media" | No construction necessary | "a timer object configured to provide the amount of the media that has been captured upon request in connection with the media" |

### 1. Plaintiff's Opening Position on Terms 12 and 18

Defendants also propose rewriting each of these terms from the '010 patent (Terms 12) and the '876 patent (Term 18). Specifically, Defendants inserted the following, highlighted language into these terms, respectively: (Term 12) "a timer object that provides *the amount of the media that has been captured* upon request in connection with the media;" and (Term 18) "a timer object configured to provide *the amount of the media that has been captured* upon request in connection with the

55

media."

The above words Defendants inserted in their proposed constructions do not appear anywhere in the claim language of these terms, and there is nothing in the intrinsic record that requires their incorporation into these claims.   Rather, Defendants simply selected those words and improperly imported them into the claims.  In fact, no construction is necessary for any of these terms, given the clarity of their plain language.  The plain and ordinary meaning of these claim terms is all that is required.  (*See* Hernandez at ¶¶ 53-54.)

## 2.  Defendants' Answering Position on Terms 12 and 18

Each of the "timer object" terms requires providing "a time reference upon request *in connection with the media*." They do not require provision of solely a "time reference." Defendants' proposal is drawn to construing "in connection with the media" in light of the specification and to giving meaning to that phrase.

The "timer object" terms in their plain and ordinary form do not directly correlate the requested "time reference" to some kind of ***timing*** relative to "***the media***" that is being indexed. The dispute between the parties involves clarification of that connection. *O2 Micro*, 521 F.3d at 1361 ("A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute.").

Defendants propose clarifying the "timer object" terms to reflect that the "time reference" claimed is "the amount of *the* media that has been captured" as drawn directly from the specification—"[i]n this case, the time stamp is simply the amount of media that has been captured, expressed in time." '010 Patent at 6:25-27. Defendants' proposal is consistent with other disclosures concerning timing in connection with the actual media being indexed. *See id.* at 6:34 ("amount of time the media has been recorded"); *id.* at 6:54-55 ("the amount of time that the media has been playing back").

### 3.  Plaintiff's Reply Position on Terms 12 and 18

Once more, under the guise of "clarifying" the claim language, Defendants rewrite the "timer object" limitations of Terms 12 and 18 to reflect that the "time reference" claimed is "the amount of the media that has been captured."  Defendants ignore the open claim language and once again seize on a single example embodiment among many (citing to '010 patent at 6:25-27, 34 and 54-55), to weave their unsupported claim construction for these "timer object" terms.   Their effort should be rejected as there is no basis for narrowing the claims in this manner.

For example, beyond the limited parts of the specification selectively cited by Defendants, the patent also states that the "timer object keeps track of the current time code, or time stamp, of the particular media being logged. The time code can be based on either a relative or an absolute time. This time code is later used in

accessing the media to jump to the correct location within an event." (See '010 patent at 5:25-29.)  The patent further recites:

> The timer object maintains the current time code. This time code may be expressed differently, depending on the manner in which the media is being used. ***For example, the time code may be expressed in two ways-it may be expressed as the difference between the current time and some arbitrary time relating to the event (Such as the beginning of the event), or it may be expressed as an absolute time in terms of the current time of day***, synchronized with, for example an atomic clock.

(*See* '010 patent at 6:12-20.)

Thus, even if importing limitations into the claims from the specification were proper, which it is not, Defendants are merely selecting which of the many aspects of the timer object they want to import.  This only adds to the confusion caused by their proposed constructions, which are not at all "clarifying" to the claim language.

In any case, the patentee did not give either of Terms 12 or 18 relating to "a timer object" a different meaning in the specification or during prosecution, or disclaim or disavow any claim scope during proseuction.  Instead, both of these terms are perfectly clear and understandable to a POSA as they stand, without any special construction.  No construction of either of Terms 12 or 18 is necessary. and they should be given their plain and ordinary meaning to a POSA.  (*See* Hernandez at ¶¶ 50-54.)

### 4.  Defendants' Sur-Reply Position on Terms 12 and 18

Plaintiff's Reply Brief ignores the actual language of the claims. As explained

in Defendants' Opening Brief, both of the "timer object" terms require providing "a time reference upon request *in connection with the media*." They do not require provision of solely a "time reference." Defendants' proposal is drawn to construing "in connection with the media" in light of the specification and to giving meaning to that phrase. Defendants' proposal does not ignore the ***claim language***, but instead embraces it.

Plaintiff's identified disclosure from the specification actually supports Defendants' clarifying construction that confirms the relationship between any "time reference" and some kind of ***timing*** relative to "***the media***" that is being indexed. In this way, Defendants' proposal does not "seize on a single example," but instead works to encompass the examples that actually correlate to the media being indexed. In this way, a "time code, or time stamp, ***of the particular media being logged***" ('010 Patent, 5:25-27 with emphasis added)[6] is equivalent to "the amount of ***the*** media that has been captured" as expressed in Defendants' proposal. Because the "time code" or "time stamp" is directly related to "the particular media being logged" it can later be used to "access[] the media to jump to the correct location within an event." *Id.*, 5:28-30 (cited *supra,* at 57-58). Figure 1, which provides the visual context of the disclosure cited by Plaintiff, shows the same with respect to the timer object by stating "Maintains elapsed time."

---

[6] *See supra,* at 57-58.

By contrast, a "time code" or "time stamp" in the abstract standing alone cannot be provided "in connection with the media" as claimed in the "timer object" terms. This because such a "time code" or "time stamp" is uncorrelated to that media. Such an uncorrelated "time code" or "time stamp" cannot be used to "access[] the media to jump to the correct location within an event" which would contradict its purpose all together.

The claims are not so broad as to encompass *any* time reference, which would read out the claimed requirement of providing "a time reference upon request *in connection with the media*." *See Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.*, 93 F.3d 1572, 1582-83 (Fed. Cir. 1996) (refusing to read a limitation out of the claim). Defendants' proposal simply seeks to clarify that scope of the claims and does so consistent with the disclosure of the '010 Patent concerning timing in connection with the actual media being indexed. *See* '010 Patent, 5:25-27 ("time code, or time stamp, *of the particular media being logged*") (emphasis added) (cited *supra,* at 57-58); 6:34 ("amount of time the media has been recorded"); *id.* at 6:54-55 ("the amount of time that the media has been playing back").

Dated:  January 23, 2023                    Respectfully submitted,


/s/ Kelly E. Farnan                         /s/ Timothy Devlin
Kelly E. Farnan (#4395)                     Timothy Devlin (No. 4241)
Griffin A. Schoenbaum (#6915)               tdevlin@devlinlawfirm.com
RICHARDS, LAYTON & FINGER, P.A.             Paul Richter (admitted *pro hac vice*)
One Rodney Square                           prichter@devlinlawfirm.com
920 N. King Street                          DEVLIN LAW FIRM LLC
Wilmington, DE 19801                        1526 Gilpin Avenue
(302) 651-7700                              Wilmington, DE 19806
farnan@rlf.com                              (302) 449-9010
schoenbaum@rlf.com

                                            *Counsel for Plaintiff*
                                            *Charles Smith Enterprises, LLC*

OF COUNSEL:

Andrew G. Strickland (*pro hac vice*)
LEE & HAYES, P.C.
75 14th Street NE, Suite 2500
Atlanta, GA 30309
(404) 815-1900
andrew.strickland@leehayes.com


Caleb Hatch (*pro hac vice*)
LEE & HAYES, P.C.
601 West Riverside Avenue, Suite
1400
Spokane, Washington 99201
509.944.4655
caleb.hatch@leehayes.com

*Attorneys for Defendant*
*Catapult Sports Inc.*

/s/ Geoffrey G. Grivner
Geoffrey G. Grivner (#4711)
BUCHANAN INGERSOLL & ROONEY PC
500 Delaware Ave., Ste. 720

Wilmington, DE 19801
(302) 552-4207
geoffrey.grivner@bipc.com

OF COUNSEL:

Robert D. Finkel
BUCHANAN INGERSOLL & ROONEY PC
Union Trust Building
501 Grant St., Ste. 200
Pittsburgh, PA 15219
(412) 562-5263
robert.finkel@bipc.com


Andrew R. Cheslock
BUCHANAN INGERSOLL & ROONEY PC
1737 King St., Ste. 500
Alexandria, VA 22314
(708) 838-6523
andrew.cheslock@bipc.com

*Attorneys for Defendant*
*DVSport, Inc.*